UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| RICHARD CARLOS HUTCHENS and | ) | |
| TAMI MARTIN HUTCHENS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.:  3:11-CV-624 |
| | ) | (VARLAN/SHIRLEY) |
| BANK OF AMERICA N.A., | ) | |
| MORTGAGE ELECTRONIC | ) | |
| REGISTRATION SYSTEM, and | ) | |
| RUBIN LUBLIN SUAREZ SERRANO, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This civil action is before the Court on the Motion to Dismiss by defendant Rubin

Lublin Suarez Serrano, LLC ("RLSS") [Doc. 5] and the Motion to Dismiss Plaintiffs'

Complaint by defendants Bank of America, N.A. ("BANA") and Mortgage Electronic

Registration Systems, Inc. ("MERS") [Doc. 9], pursuant to Federal Rules of Civil Procedure

8 and 12(b)(6).  In the motions, defendants move the Court to dismiss all claims of plaintiffs,

Richard and Tami Hutchens, for failure to state a claim upon which relief may be granted and

because the claims fail as a matter of law.  Plaintiffs have not responded to the motions to

dismiss and the time for doing so has passed.  *See* E.D. Tenn. L.R. 7.1(a), 7.2.

After careful consideration and for the reasons stated herein, the motions to dismiss

[Docs. 5, 9] will be **GRANTED**, plaintiffs' claims will be **DISMISSED**, and this case will

be **CLOSED**.

## I.     Relevant Facts

The following facts are taken from the complaint and the exhibits attached thereto [Doc. 1] and will be assumed as true for purposes of the motions to dismiss.[1]  *See, e.g.*, *Directv, Inc. v. Treesch*, 487 F.3d 471, 476 (6th Cir. 2007) (noting that in ruling upon motions to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff").

According to the complaint, around March 28, 2008, plaintiffs obtained a $168,000.00 loan (the "Loan") and executed a promissory note (the "Note") and deed of trust (the "DOT") secured by real property located at 205 Candora Road, Maryville, Tennessee (the "Property") [Doc. 1, ¶ 6; Doc. 1-2, p. 30].  The DOT lists Sidus Financial, LLC ("Sidus") as the lender, PBRE, Inc. ("PBRE") as the trustee, and MERS as the nominee and beneficiary of the lender [Doc. 1, ¶ 6; Doc. 1-2, pp. 48-68].  The DOT requires the borrower to pay principal, interest, and funds for escrow items, including "Mortgage Insurance Premiums" [Doc. 1-2].  The DOT also provides that "[a]ny waiver [of an escrow item] must be in writing" and if the

---

[1]The Court may consider exhibits attached to an original complaint without converting a motion to dismiss into one for summary judgment.  *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (stating that when a court is presented with a Rule 12(b)(6) motion, "it may consider the [c]omplaint and any exhibits attached thereto . . . and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein").

The complaint in this case consists of more than 150 pages of exhibits relating to plaintiffs' loan and deed of trust securing real property owned by plaintiffs, including the deed of rust, documents pertaining to the note, and copies of written communication between the parties.

2

borrower sends payment or partial payment to the lender, the lender "may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower." [Doc. 1-2]. According to the complaint, around May 9, 2008, Sidus informed plaintiffs that the Loan had been sold to Countrywide Home Loans Servicing, LP ("Countrywide") and, that as of June 1, 2008, all future mortgage payments were to be made to Countrywide [Doc. 1, ¶ 7]. Plaintiffs allege that "at some point" thereafter, BANA "acquired" Countrywide and assumed being the servicing agent for Countrywide's home loan mortgages, including plaintiffs' [*Id.*, ¶ 8].[2]

In October 2010, plaintiffs started having difficulty making the $1,252.41 monthly mortgage payment, including $58.80 for mortgage insurance [*Id.*, ¶¶ 9, 10]. Plaintiffs allege that on November 18, 2010, they inquired of BANA how much of a payment would be needed to bring down the principal balance. On November 29, 2010, plaintiffs allege that a BANA representative advised them that BANA would cancel plaintiffs' monthly mortgage insurance requirement in return for an additional $2,300.00 principal payment paid prior to plaintiffs' December mortgage payment [*Id.*, ¶¶ 10, 11]. On December 1, 2010, plaintiffs sent BANA a $2,300.00 check to be applied to the principal balance and a $1,193.61 check

---

[2]Countrywide changed its name to BAC Home Loans Servicing, LP and BAC Home Loans Servicing, LP ("BAC") [*See* Doc. 10, p. 3 n.3]. On July 1, 2011, BAC merged into and became part of BANA [*See id.*]. BANA has appeared and filed its motion to dismiss as successor by merger to BAC, f/k/a Countrywide [*See id.*].

to be applied to the December 2010 mortgage payment [*Id.*, ¶ 12; Doc. 1-2, p. 6].[3] According to the complaint, BANA failed to honor its representative's promise to cancel the mortgage insurance requirement [*Id.*, ¶ 13].

In January 2011, plaintiffs allege that they mailed to BANA and Sidus several letters of inquiry outlining their problems with making their mortgage payments [*Id.*, ¶¶ 13-18]. Sidus again informed plaintiffs that the mortgage had been sold to Countrywide and that Sidus no longer had a financial interest in plaintiffs' home or the Loan [*Id.*, ¶¶ 18-19]. Plaintiffs did not make their February 2011 mortgage payment [*Id.*, ¶¶ 20, 21]. On February 22, 2011, plaintiffs received a notice of intent to accelerate from BANA due to plaintiffs' failure to cure a $1,360.90 default on their Loan [*Id.*, ¶ 22; Doc. 1-2, p. 15]. Plaintiffs allege that they gave notice to BANA about its failure to take responsibility for the BANA representative's incorrect advice to them regarding the cancellation of the mortgage insurance [Doc. 1, ¶¶ 24-28].

On March 4, 2011, BANA notified plaintiffs that it had no record of any communication with plaintiffs regarding the cancellation of the mortgage insurance; that a property appraisal was needed before BANA could waive the requirement that borrowers have mortgage insurance; and that BANA was unable to return the $2,300.00 payment because the Loan was in default given plaintiffs' failure to make the February 2011 mortgage payment [*Id.*, ¶ 20; Doc. 1-2, pp. 19-20].

---

[3]Presumably, this amount represents plaintiffs' $1,252.41 monthly mortgage payment, less $58.80, the monthly insurance payment.

On April 20, 2011, plaintiffs mailed a "qualified written request" letter to BANA. The letter contained a list of questions pertaining to the Loan, the transaction history of the Loan, loan insurance, and a request that BANA send to plaintiffs a copy of the loan transaction history statement [Doc. 1, ¶ 34; Doc. 1-2, pp. 25-28]. On March 4, 2011, BANA responded to plaintiffs' April 20, 2011 letter by mailing "all available loan documents" to plaintiffs, including a loan transaction history statement [Doc. 1, ¶ 38; Doc. 1-2, pp. 29, 69]. On May 10, 2011, BANA sent plaintiffs a letter stating that BANA "has carefully reviewed the information you provided [in the April 20, 2011 letter] and has determined that your inquiry does not appear to be specifically related to a servicing concern related to your loan. Your loan remains in full force and effect, and we will continue to service your loan in accordance with the valid, binding loan documents that you signed." [Doc. 1 ¶¶ 41-42; Doc. 1-2, p. 77].

On June 6, 2011, MERS recorded an assignment of DOT to BANA [Doc. 1, ¶ 45; Doc. 1-2, p. 80]. On July 1, 2011, RLSS, acting as BANA's foreclosure counsel, notified plaintiffs that BANA intended to foreclose on the Property [Doc. 1, ¶¶ 63-66; Doc. 1-2, p. 83]. On July 12, 2011, RLSS prepared a transfer and assignment of DOT for the purpose of MERS acting as nominee for the lender [Doc. 1, ¶ 71; Doc. 1-2, p. 92]. On August 26, 2011, RLSS notified plaintiffs that BANA was the current holder of the Note, that the total amount due under the Loan was $167,072.01, and that $9,019.45 was needed to cure the default [Doc. 1, ¶¶ 93-95; Doc. 1-2, p. 94]. On August 23, 2011, MERS recorded a transfer and assignment of DOT to BANA [*Id.*, p. 92]. These documents were recorded and, according to plaintiffs, improperly notarized [*See generally* Doc. 1].

5

On September 20, 2011, RLSS sent plaintiffs notice that unless they paid the amount due under the Loan, the Property would be sold at a public foreclosure sale on October 20, 2011 [Doc. 1, ¶¶ 95-101; Doc. 1-2, p. 96]. Plaintiffs did not make the payment. On October 31, 2011, RLSS notified plaintiffs that the foreclosure sale had taken place and that Freddie Mac had purchased the Property [Doc. 1, ¶¶ 95-101; Doc. 1-2, p. 107]. In December 2011, RLSS, as duly appointed trustee, recorded a substitute trustee's deed transferring the DOT to Freddie Mac [Doc. 1, ¶ 109; Doc. 1, p. 115]. Thereafter, on November 23, 2011, plaintiffs sent BANA another letter designated a "qualified written request." This letter lists essentially the same questions plaintiffs put to BANA in the April 20, 2011 letter [Doc. 1, ¶¶ 117-18; Doc. 1-2, p. 120].

On November 28, 2011, Freddie Mac filed suit against plaintiffs in state court for a detainer summons for failing to vacate the Property [Doc. 1, ¶ 119; Doc. 1-2, p. 125]. In December 2011, plaintiffs filed a response and motion to dismiss the state court action on grounds that Freddie Mac lacked standing to foreclose [Doc. 1, ¶ 128; Doc. 1-2, p. 127]. On December 29, 2011, with the state action pending, plaintiffs filed this action against BANA, MERS, and RLSS, and a motion to compel defendants to show clear unbroken chain of title of the Note and DOT [*See generally* Doc. 1; Doc. 1-2, p. 146].

In one short paragraph in the complaint, plaintiffs claim that defendants violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.*, and the National Housing Act ("NHA"), 12 U.S.C.

6

§ 1701x(c)(5) [Doc. 1, ¶ 4]. The complaint alleges "possible" or "potential" violations of these various statutes. Plaintiffs do not allege which defendants violated which statutes, do not allege how each defendant violated the statutes, and do not allege which provisions of the statutes were violated. Liberally construing the complaint, it appears that plaintiffs also attempt to assert allegations of wrongful foreclosure and fraudulent assignment of the DOT. In the prayer for relief, plaintiffs refer generally to "defendants," request that defendants be ordered to pay $1,000.000.00 as punitive damages, and request that the Court order Freddie Mac, a non-party, to provide evidence of a clear unbroken chain of title for the Note and the DOT [Doc. 1, pp. 20-21].

## II.     Standard of Review

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In 2007, the United States Supreme Court modified the pleading standard in the context of antitrust cases. *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notably, the Supreme Court held that in order to survive a 12(b)(6) motion to dismiss—which attacks the sufficiency of a complaint—the plaintiff must state a claim for relief that is plausible on its face. *Id.* In 2009, the Supreme Court extended the *Twombly* (or plausibility) standard to all federal civil cases. *Ashcroft v. Iqbal*, 556 U.S. 662, —, 129 S.Ct. 1937, 1953 (2009).

In order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain allegations supporting all material elements of the claims. *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). In determining whether to grant a

motion to dismiss, all well-pleaded allegations must be taken as true and must be construed most favorably toward the non-movant. *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003). Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555. A formulaic recitation of the elements of a cause of action will not do. *Id.* Nor will an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1937. A pleading must instead "contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436-37 (6th Cir. 1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

Plaintiffs are proceeding *pro se*. The Court is "ever mindful that *pro se* complaints are liberally construed and are held to less stringent standards than the formal pleadings prepared by attorneys." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). However, the "lenient treatment generally accorded to *pro se* litigants has limits." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). "Neither this Court nor other courts . . . have been willing to abrogate basic pleading essentials in *pro se* suits." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) (citing cases). Liberal federal pleading standards do not permit litigants, even those acting *pro se*, to proceed on pleadings that are not readily comprehensible. *Cf. Becker v. Ohio State Legal Servs. Ass'n*, 19 F. App'x 321, 322 (6th Cir. 2001) (upholding district court's dismissal of *pro se* complaint containing "vague and conclusory allegations

8

unsupported by material facts"); *Janita Theresa Corp. v. United States Attorney*, No. 96-1706, 1997 WL 211247, at *1 (6th Cir. Apr. 28, 1997) (upholding district court's dismissal of *pro se* complaint whose allegations were "far too muddled to serve as a basis for a proper suit").

## III.   Analysis

Plaintiffs have failed to respond to either of the motions to dismiss and the time period for responding to the motions has expired.  E.D. Tenn. L.R. 7.1(a), 7.2.  Failure to respond to a motion may be treated as acquiescence to the relief sought.  E.D. Tenn. L.R. 7.2 ("[f]ailure to respond to a motion may be deemed a waiver of any opposition to the relief sought").  *See also Campbell v. McMinn Cnty, Tenn.*, No. 1:10-CV-278, 2012 WL 369090, at *2 (E.D. Tenn. Feb. 3, 2012) ("Plaintiff's failure to respond effectively waives any objections that he may have had on this matter.").  Thus, while defendants' motions to dismiss may be granted based solely upon plaintiffs' failure to respond, the Court will discuss the additional grounds upon which it finds that plaintiffs' claims cannot withstand defendants' motions to dismiss.

### A.   RESPA

Taking the allegations in the complaint as true and construed in the light most favorable to plaintiffs, it appears that plaintiffs have attempted to assert a claim for a violation of RESPA under to § 2605.  A borrower can sue a servicer under § 2605 for failure

9

to disclose whether loan servicing rights may be transferred. 12 U.S.C. § 2605.[4] Section 2605 requires that a borrower be notified of certain loan servicing transfers and receive certain information upon request. *Id.* Subsection (e) of § 2605 specifically requires "any servicer of a federally related mortgage loan" to respond to a "qualified written request" (a "QWR") from the borrower that seeks "information relating to the servicing" of the loan. *Id.* § 2605(e)(1)(A). Section 2605(e)(1)(B) defines a QWR as a written request that:

> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

*Id.* § 2605(e)(1)(B). Upon receiving a QWR, a servicer is required to acknowledge receipt of the request within twenty (20) days and required to provide a response to the borrower within sixty (60) days. *Id.* § 2605(e)(1)(A), (e)(2). The servicer must then either correct the error pointed out by the borrower, or conduct an investigation and provide a written explanation containing either "a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer" or "[the] information requested by the borrower or an explanation of why the information requested is unavailable." *Id.* § 2605(e)(2)(A)-(C).

---

[4]In addition to a cause of action under § 2605, RESPA contains two other provisions allowing private causes of action. Section 2607 provides a cause of action for improper referral kickbacks. 12 U.S.C. § 2607. Section 2608 prohibits a seller from requiring certain title insurance purchases. *Id.* § 2608. Plaintiffs' complaint contains no allegations relating to improper kickbacks or title insurance.

Only "services" of a federally related mortgage loan are duty-bound by RESPA to respond to QWRs. *Id.* § 2505(e). Failure to plead that a defendant is in fact a loan servicer will defeat a plaintiff's cause of action under RESPA, as it has not been established that the defendant's liability is plausible under the *Iqbal/Twombly* standard. *See, e.g., Gibson v. Mortg. Elec. Registration Sys.*, No. 11-2173-STA, 2011 WL 3608538, at *4 (W.D. Tenn. Aug. 16, 2011) (finding that the failure to plead that a defendant law firm is a servicer defeats a plaintiff's RESPA claim for liability based on the law firm's failure to respond to a QWR). Here, plaintiffs have not alleged that RLSS or MERS are "servicers" of a federally related mortgage loan under RESPA. Accordingly, neither RLSS or MERS had a duty to respond to plaintiffs' QWR and plaintiffs' RESPA claim against these defendants cannot be sustained.

Plaintiffs have alleged facts sufficient to state that BANA was a servicer of a federally related mortgage loan to whom plaintiffs sent two QWRs, one on April 20, 2011, and one on November 23, 2011. Plaintiffs have not alleged, however, that BANA failed to timely acknowledge receipt and respond to the QWRs as required by § 2605. *See, e.g., Mekani v. Homecomings Fin. LLC*, 752 F. Supp. 2d 785, 795 (E.D. Mich. 2010) (holding that when a servicer responds to a QWR and the plaintiff argues that the response is inadequate, the plaintiff must offer factual content or cite some authority to suggest why the response was inadequate). As shown by the documents attached to plaintiffs' complaint, in response to plaintiffs' April 20, 2011 letter, BANA provided plaintiffs a loan history statement which gives a history of payments, servicing expenses to third parties, tax and insurance payments,

and late charges assessed and paid [Doc. 1-2, pp. 29, 69-77; Doc. 1, ¶¶ 38, 39]. BANA also indicated in its response to the April 20, 2011 letter that plaintiffs had requested additional information not specifically related to a servicing concern related to the Loan and BANA's obligations under RESPA [Doc. 1-2, p. 77]. The Court has also reviewed the substance of plaintiffs' QWRs and finds that while the substance of plaintiffs' letters may have enabled BANA to identify plaintiffs' names and account information, the letters do not include "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provide[] sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). Finally, as to the November 23, 2011 letter, the sixty (60) day period under RESPA for a servicer to respond to a QWR would not have expired until after December 29, 2011, the date plaintiffs filed their complaint. *See, e.g., Kilesch v. Fifth Third Mortg. Co.*, 3:10-0600, 2010 U.S. Dist. LEXIS 125686, at *7-*8 (M.D. Tenn. Nov. 29, 2010) ("Because Plaintiff filed this lawsuit before Defendant's time for providing the requested information had passed, Plaintiff's claim that Defendant failed to furnish him the requested information is premature.").

Last, plaintiffs have not alleged any damages as a result of the alleged violation of RESPA. District courts within the United States Court of Appeals for the Sixth Circuit and other circuits have held that a plaintiff must allege actual damages to obtain relief under RESPA. *See, e.g., Lee v. EquiFirst Corp.*, No. 3:10-cv-809, 2010 WL 4320714 (M.D. Tenn. Oct. 26, 2010) ("Courts have repeatedly held that alleging a breach of RESPA duties alone does not state a claim under RESPA . . . Plaintiffs must, at a minimum, also allege that the

12

breach resulted in actual damages") (internal citations and quotations omitted); *Allen v. United Fin. Mortg. Corp.*, 660 F. Supp. 2d 1089, 1097 (N.D. Cal. 2009) (collecting cases). Here, plaintiffs request that the Court issue a cease and desist order as to the foreclosure, order defendants to release all invalid lien claims on the Property, order that all negative information be removed from plaintiffs' credit report, and that the Court order payment of punitive damages and miscellaneous expenses incurred by plaintiffs in their pursuit of this action [Doc. 1, pp. 20-21]. There are no allegations or requests for actual damages.

According, and for the reasons given above, the Court finds that plaintiffs have failed to state a claim under RESPA against RLSS, MERS, and BANA, and plaintiffs' RESPA claim will be **DISMISSED** as to all defendants.

## B.     The TILA

The TILA "'was enacted to promote the informed use of credit by consumers by requiring meaningful disclosure of credit terms.'" *Barrett v. JP Morgan Chase Bank, N.A.*, 445 F.3d 874, 875 (6th Cir. 2006) (quoting *Begala v. PNC Bank, Ohio, N.A.*, 163 F.3d 948, 950 (6th Cir. 1998)). The TILA's dual purpose is to "to facilitate the consumer's acquisition of the best credit terms available; and to protect the consumer from divergent and at times fraudulent practices stemming from the uniformed use of credit." *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1040 (6th Cir. 1984) (citation omitted). Section 1638(a) of the TILA requires a creditor to make certain disclosures, 15 U.S.C. § 1638(a), and "'[t]he only parties who can be liable for . . . violations [of the TILA] are the original creditor, 15 U.S.C. § 1640, and assignees of that creditor, 15 U.S.C. § 1641." *Sherrell v. Bank of Am., N.A.*, No. CV F

13

11-1785 LJO JLT, 2011 U.S. Dist. LEXIS 147427, at *31 (E.D. Cal. Dec. 22, 2011). In addition, the "TILA expressly disclaims liability for servicers 'unless the servicer is or was the owner of the obligation.' 15 U.S.C. § 1641(f)(1)." *Stewart v. BAC Home Loans Servicing, LP*, No. 10 C 2033, 2011 U.S. Dist. LEXIS 24715, at *9 (N.D. Ill. Mar. 10, 2011). The TILA allows an action for damages, including "actual damages," statutory damages in the amount of "not less than $400 or greater than $4,000[,]" and costs and attorney's fees. 15 U.S.C. § 1640(a)(1)-(3). Under § 1640(e) "any action under this section may be brought in any United States district court . . . within one year from the date of the occurrence of the violation[.]" *Id.* § 1640(e).

Plaintiffs have not explicitly alleged that RLSS, BANA, or MERS are creditors, assignees of a creditor, or servicers that are the owners of the obligation. However, assuming one or all defendants fall within one of these categories, plaintiffs have also not alleged what, if any, provision of the TILA was violated by any defendant or how any defendant violated that provision. Rather, plaintiffs make only the conclusory assertion that defendants violated the TILA. *See, e.g., Elsman v. Std. Fed. Bank*, 46 F. App'x 792, 799-80 (6th Cir. 2002) (holding that conclusory assertions that the defendants' actions violated the TILA fail to adequately plead actionable claims); *Yaldu v. Bank of Am. Corp.*, 700 F. Supp. 2d 832, 842 (E.D. Mich. 2010) (dismissing the plaintiff's claim because "[t]here are no allegations that [the defendant] owns the obligation. Therefore, [the defendant] cannot be held liable under the TILA").

Additionally, given the facts alleged in the complaint, a claim under the TILA would be barred by the TILA's one-year statute of limitations. 15 U.S.C. § 1640(e). Plaintiffs allege that they executed the DOT on March 28, 2008 [Doc. 1, ¶ 6]. Thus, the latest date upon which plaintiffs could have brought their claim for a violation of the TILA was one year later, on March 28, 2009. Plaintiffs filed the complaint initiating this action on December 29, 2011, over two and a half years after the consummation of the loan transaction.

In sum, plaintiffs' claim under the TILA will be **DISMISSED** as to all defendants for the reasons stated above.

### C.    The FDCPA

In the complaint, plaintiffs cite to the FDCPA without listing a specific provision that was violated and without alleging sufficient facts to suggest how the alleged violation occurred. Under the FDCPA, a plaintiff may bring a civil action against a debt collector who engages in "abusive debt collection practices," 15 U.S.C. §§ 1692(e), 1692k. Liability under the FDCPA attaches only to a defendant that qualifies as a "debt collector," a statutorily defined term. *See Kristner v. Law Offices of Michael P. Margelefsky, LLC*, 518 F.3d 433, 435-36 (6th Cir. 2008). The FDCPA definition of "debt collector" provides, in relevant part:

> [A]ny person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another[.]   [T]he term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which

15

would indicate that a third person is collecting or attempting to collect
such debts.

15 U.S.C. § 1692a(6). This definition of debt collector "does not include . . . any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(iii); *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003) (stating that the statutory definition of debt collector "does not include the consumer's creditors") (internal quotation marks omitted); *see also* 15 U.S.C. § 1692a(4) (defining a "creditor" as "any person who offers or extends credit creating a debt or to whom a debt is owed").

Plaintiffs have not alleged that RLSS, BANA, or MERS were debt collectors or that these entities engaged in abusive debt collection practices in violation of the FDCPA. *See, e.g., Romberger v. Wells Fargo Bank, N.A.*, No. 07-13210, 2008 WL 3838026, at *4 (E.D. Mich. Aug. 14, 2008) (stating that because there are no allegations that MERS transmitted correspondence to the plaintiff to collect on debts other than those it was directly owed, MERS, as the original mortgagee in the position of a creditor, does not "satisfy the statutory definition of a 'debt collector' under the FDCPA"); *Stamper v. Wilson & Associates, PLLC*, No. 3:09-cv-270, 2010 U.S. Dist. LEXIS 31770, at *12 (E.D. Tenn. Mar. 31, 2010) (collecting and discussing cases and noting that the majority of courts have held that law firms conducting non-judicial foreclosures are not liable under the general provisions of the

16

FDCPA because they are merely enforcing a security interest as opposed to collecting a debt).

Furthermore, in the portion of the complaint that refers to the FDCPA, there are no alleged facts regarding what actions were taken by RLSS, BANA, or MERS that were in violation of the FDCPA. Rather, beginning at paragraph 64 of the complaint, plaintiffs set forth a history of correspondence between plaintiffs, BANA, RLSS, and Sidus, but do not identify, as to any defendant, conduct that violated the FDCPA. Instead, plaintiffs set forth allegations of indicators of fraud and of "anomalies" in various documents, including in the transfer and assignment of DOT. As noted above, the FDCPA prohibits a wide-range of conduct associated with debt collection activities. While plaintiffs' complaint refers to letters sent by BANA and RLSS to plaintiffs regarding the foreclosure and default, including a notice of acceleration of the Loan, there are no factual allegations describing these letters as harassing or abusive and no allegations identifying other abusive debt collections practices such as harassing phone calls or attempts to collect from individuals not obligated on the Loan.

Furthermore, although the time-line of events is somewhat unclear from the complaint, it appears to the Court that defendants would not fall into the statutory definition of "debt collectors." Countrywide, later BAC, merged with BANA and acquired the Loan from Sidus sometime after March 2008, but before October 2010 [Doc. 1, ¶¶ 6-10]. Plaintiffs allege that they contacted BANA in November 2010 regarding the Loan and that in February 2011, BANA notified plaintiffs that the Loan was in default, followed by various

communications between BANA and plaintiff [*Id.*, ¶¶ 13-22]. Taking these allegations as true, BANA does not meet the statutory definition of a debt collector under § 1692a(6)(F)(iii) because BANA acquired the Loan prior to default and thus, BANA is not a "non-originating debt holder that either acquired a debt in default or . . . treated the debt as if it were in default at the time of acquisition." *Bridge v. Ocwen Fed. Bank, FSB*, — F.3d —, —, 2012 WL 1470146, at \*6 (6th Cir. Apr. 30, 2012); *see* 15 U.S.C. § 1692a(6)(F)(iii).

In sum, having no factual allegations to support an FDCPA claim as to any defendant, plaintiffs' claim under the FDCPA will be **DISMISSED**.

### D.     The NHA

Plaintiffs also allege that defendants violated 12 U.S.C. § 1701x(c)(5) because "a clause in the mortgage contract proposes that by signing the contract the mortgagor waives rights to contest foreclosure actions" while plaintiffs, in fact, "can not waive their right to due process guaranteed by the Constitution." [Doc. 1, ¶ 4]. Section 1701x(c)(5) requires lenders to provide notice of home ownership counseling to certain qualifying low and moderate income homeowners. *See* 12 U.S.C. § 1701x(c)(5). Based on the Court's review of this statute and the allegations in the complaint, the Court can discern no legal or factual grounds for plaintiffs' allegation that defendants committed a violation of § 1701x(c)(5). Accordingly, this claim will also be **DISMISSED** as to all defendants.

### E.     Claim of Wrongful Foreclosure

Plaintiffs assert that defendants wrongfully foreclosed on the Property and that they are "uncertain whether RLSS actually held a public auction for the Plaintiff's [sic] property

18

on the front entrance steps of the Blount County Court house[.]" [Doc. 1, ¶ 101]. However, according to the DOT executed by plaintiffs and attached to the complaint, MERS is a beneficiary with authority to act on behalf of the lender [Doc. 1; Doc. 1-2, pp. 48-60]. The DOT also gives the lender the right to foreclose on the Property in the event of default [Doc. 1-2, pp. 48-60]. Plaintiffs also acknowledge in the complaint that they did not make the required monthly mortgage payments on the Loan and that MERS, in its capacity as nominee for the lender, assigned the DOT to BANA, which initiated foreclosure proceedings as a result of plaintiffs' default [Doc. 1, ¶ 20]. According to the complaint, following the foreclosure sale of the Property on October 20, 2011 to Freddie Mac, RLSS recorded a substitute trustee's assignment of DOT [Doc. 1-2, pp. 98, 117]. The substitute trustee's deed, attached to plaintiffs' complaint, transfers the DOT to Freddie Mac and certifies that a public auction occurred and that it was held in accordance with Tennessee law [*Id.*]. Thus, given these allegations and the exhibits attached to the complaint, the DOT is in accordance with the applicable law, BANA was authorized to foreclose on the Property, and Freddie Mac rightfully took possession of the Property. *See, e.g., Ferguson v. Booth*, 160 S.W. 67, 69 (Tenn. 1913) (stating that recitals in a deed are prima facie evidence of the facts within the document).

Plaintiffs' challenge to the role of MERS in the foreclosure of the Property is unclear, but the Court notes that it has long been well-settled that under Tennessee law, any assignment of a note automatically transfers beneficial ownership of the accompanying deed of trust. *See W.C. Early Co. v. Williams*, 186 S.W. 102, 103 (Tenn. 1916) ("It is a

19

well-settled rule with us that the lien of a mortgage or trust deed passes, without a special assignment thereof, to the endorsee of a note or transferee of the debt secured by the instrument."); *Clark v. Jones*, 27 S.W. 1009, 641 (1894) ("The transfer of the note, without more, carried with it the lien created by the deed of trust.").  The role of MERS in the mortgage process has also been validated by courts, including those within the Sixth Circuit. *See, e.g., Golliday v. Chase Home Fin.*, LLC., No. 1:10-cv-532, 2011 WL 4352554, at *7 (W.D. Mich. August 23, 2011) (stating that courts have uniformly approved of the role of MERS in mortgage transactions); *see also, e.g., In re Mortg. Elec. Registration Sys. (MERS) Litig.*, MDL No. 09-2119-JAT, 2011 WL 4550189, at *3-*4 (D. Ariz. Oct. 3, 2011); *Ciardi v. Lending Co., Inc.*, No. CV 10-0275-PHX-JAT, 2010 WL 2079735, at *3-*4 (D. Ariz. May 24, 2010) (dismissing the argument that the mere listing of MERS as the beneficiary renders the deed of trust invalid).  Plaintiffs also acknowledge in the complaint that per the DOT, MERS may act as nominee for the lender and its successor and assigns.  Several courts have noted that this language explicitly grants MERS the power to act as the agent of any valid note holder, including assigning a deed of trust and enforcing a note.  *See e.g. Golliday*, 2011 WL 4352554, at *7; *Ciardi*, 2010 WL 2079735, at *3.  Plaintiffs have also offered no legal or factual allegation or basis for disregarding the DOT executed by plaintiffs.  As noted *supra*, the lender, or any party that succeeds the lender as the holder of the Note, is the beneficial owner of the DOT, with MERS serving as the nominee.  Accordingly, any claim for wrongful foreclosure plaintiffs have attempted to assert based on the role of MERS in the foreclosure of the Property will be **DISMISSED**.

Plaintiffs' allegations that the assignment of the DOT is invalid because the assignment was fraudulent, "robo-signed," and improperly notarized also fails to state a claim for wrongful foreclosure. A claim for fraud is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), "a plaintiff must, at a minimum, allege the time, place and content of the alleged misrepresentation upon which he or she relied; the fraudulent intent of the defendants and the injury resulting from the fraud." *Gebhardt v. GMAC Mortg., LLC*, No. 3:09-CV-425, 2010 WL 2901823, at *4 (E.D. Tenn. July 21, 2010) (citing *Calipari v. Powertel, Inc.*, 231 F. Supp. 2d 734, 735-36 (W.D. Tenn. 2002) (citations omitted)). Plaintiffs' allegation that the assignment of DOT was fraudulent does not satisfy this heightened pleading standard. Additionally, under Tennessee law, assignments are not required, *see supra W.C. Early Co.*, 186 S.W. at 103, and further, the assignment of DOT, attached to the complaint, is stamped with a notary seal, which "provides prima facie proof of a notary's official character . . . [and] authenticates the instrument." *In re Marsh v. Fleet Mortg. Grp.*, 12 S.W.3d 449, 453 (Tenn. 2000). Finally, the Court notes that a litigant who is not a party to an assignment lacks standing to challenge that assignment. *See, e.g., Livonia Properties Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*, 399 F. App'x 97, 102-03 (6th Cir. 2010) (finding a lack of standing under Michigan law).

**IV.    Conclusion**

For the reasons stated above, the motions to dismiss [Docs. 5, 9] will be **GRANTED**, plaintiffs' claims against RLSS, BANA, and MERS will be **DISMISSED**, and the Clerk will be **DIRECTED** to **CLOSE** this case.  An appropriate order will be entered.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE